Lloyd B. Miller
AK Bar No. 7906040
Rebecca A. Patterson
AK Bar No. 1305028
SONOSKY, CHAMBERS, SACHSE,
  MILLER & MONKMAN, LLP
725 East Fireweed Lane, Suite 420
Anchorage, AK 99503
(907) 258-6377
Fax: (907) 272-8332
lloyd@sonosky.net
rebecca@sonosky.net

Attorneys for Plaintiff Alaska Native Tribal Health Consortium

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| ALASKA NATIVE TRIBAL HEALTH CONSORTIUM, <br><br> Plaintiff, <br><br> v. <br><br> XAVIER BECERRA, Secretary, U.S. Department of Health and Human Services, <br><br> and <br><br> UNITED STATES OF AMERICA, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) Case No. _____ <br><br> **COMPLAINT** |

## I. INTRODUCTION

1.      This action seeks damages for the failure of the Secretary of Health and

Human Services, through the Indian Health Service (IHS), to pay the Alaska Native Tribal

Health Consortium (ANTHC) certain "contract support costs" due under ANTHC's contract with IHS in Fiscal Year (FY) 2014. ANTHC's rights arise under its contract and the statute under which the contract was awarded, the Indian Self-Determination and Education Assistance Act, 25 U.S.C. §§ 5301–5423 (ISDA).

2. This action follows several Supreme Court decisions finding the federal government's failure to pay full contract support costs to contractors like ANTHC to be contrary to law and a breach of contract. *See Salazar v. Ramah Navajo Chapter*, 567 U.S. 182, 192-94 (2012); *Arctic Slope Native Ass'n v. Sebelius*, 133 S. Ct. 22 (2012), *on remand* 501 Fed. App'x 957, 959 (Fed. Cir. 2012) (*Arctic Slope II*); *Cherokee Nation v. Leavitt*, 543 U.S. 631, 636-38 (2005) (consolidated cases).

3. ANTHC seeks as damages the unpaid contract support cost funds which the Secretary should have paid in FY 2014.

## II. JURISDICTION

4. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1362; 25 U.S.C. §§ 5331(a), 5531(d); and 41 U.S.C. § 7104 of the Contract Disputes Act (CDA).

## III. PARTIES

5. The Alaska Native Tribal Health Consortium (ANTHC) is a tribal organization and at all relevant times carried out a self-governance compact and associated funding agreement with the Secretary of Health and Human Services pursuant to Title V of the ISDA, 25 U.S.C. §§ 5381–5399 and section 325 of Pub. L. No. 105-83, 111 Stat. 55 (1997).

6.      Xavier Becerra is the Secretary of the U.S. Department of Health and Human Services (DHHS). Secretary Becerra exercises limited responsibilities delegated to him by Congress pursuant to the ISDA and other applicable law, including authority to enter into contracts on behalf of the United States with Indian tribes and tribal organizations pursuant to the ISDA and other applicable law. Secretary Becerra has further delegated some of these responsibilities to officials of the Indian Health Service (IHS), an agency located within DHHS. As used throughout this Complaint (and unless context commands otherwise), the terms "Secretary," "DHHS," and "IHS" are used interchangeably.

7.      The United States of America is responsible for payment of all contracts with the Federal government. Pursuant to provisions of the CDA and the ISDA, the United States has waived its sovereign immunity from suit for breach of contract actions.

## IV. FACTS AND GENERAL ALLEGATIONS

**A.      The Contract Documents.**

8.      During FY 2014, ANTHC operated various Federal health care programs, functions, services, and activities pursuant to Compact No. 58G990058 and its associated funding agreement (collectively referred to in this Complaint as the "contract").

9.      Pursuant to the contract, in FY 2014 ANTHC co-managed the Alaska Native Medical Center (ANMC), a 173-bed tertiary-care hospital located in Anchorage, Alaska, through which it provides comprehensive medical services (including inpatient hospital care and specialty care) for the Alaska Tribal Health System. These services included critical care, emergency medicine, internal medicine, ophthalmology, orthopedic services, otolaryngology, surgery, cardiology, hematology-oncology, clinical and anatomic

laboratory, imaging, pharmacy, respiratory care, and social services. Further, ANTHC provided wellness programs, disease research and prevention, and rural provider training, and supported efforts in public health, traditional foods and nutrition, epidemiology, environmental health, and dental health education (among other programs).

10.    The programs described in paragraph 9 of this Complaint were operated pursuant to the Alaska Tribal Health Compact ("the Compact") with IHS.[1]  Ex. A.  The Compact is the basic contract document at issue in this case. The terms of the Compact are required by and inextricably intertwined with the ISDA.  The Compact states that it "shall be liberally construed to achieve its purposes[.]"  Compact, art. I, § 2.  Similarly, Title V, which governs the Compact, provides that "[e]ach provision of [Title V] and each provision of a compact or funding agreement shall be liberally construed for the benefit of the Indian tribe participating in self-governance and any ambiguity shall be resolved in favor of the Indian tribe."  25 U.S.C. § 5392(f).

11.    The Compact was written to "carry out a Self-Governance Program authorized by Title V, and is intended to transfer to tribal governments, at a tribe's request, the power to decide how federal programs, services, functions and activities (or portions thereof) shall be funded and carried out."  Compact, art. I, § 2(a).  It was also meant to

---

[1] The Alaska Tribal Health Compact has been frequently amended and restated since the first version went into effect on October 1, 1994.  Relevant to the claims presented here is the FY 2011 version that went into effect on October 1, 2010, and all citations in this Complaint are to that version.

"promote[] the autonomy of the Tribes in Alaska in the realm of health care." *Id.*

Consistent with this purpose, the Compact relies heavily on the provisions of the ISDA.

12.     The core purpose of the Compact between IHS and ANTHC is:

> to enable [ANTHC] to re-design health programs, activities, functions, and services of the Indian Health Service; to reallocate funds for programs, activities, functions, or services according to the priorities of [ANTHC]; to enhance the effectiveness and long-term financial stability of [ANTHC]; and to streamline the federal Indian Health Service bureaucracy.

Compact, art. I, § 2(b).

13.     The contract documents also include ANTHC's Funding Agreement (FA). Funding agreements can cover single or multiyear periods and may be amended throughout the year to take account of appropriations changes and new funds that are made available. *See* 25 U.S.C. § 5385(e) ("[E]ach funding agreement shall remain in full force and effect until a subsequent funding agreement is executed."). In FY 2014, ANTHC operated pursuant to the multiyear FY 2011-2015 FA for its Title V funds. Ex. B (excluding exhibits). ANTHC's FA was incorporated in its entirety into the Compact. *See* Compact, art. II, § 2(c).

14.     The contract documents that are controlling for the FY 2014 claim asserted here are the Alaska Tribal Health Compact, the FA in effect for that year under the Compact, modifications to those documents, and the various statutory and administrative provisions incorporated by law into the contract documents, including the ISDA.

## B.     The Contract Agreement.

15.     ANTHC's contractual obligation was to administer designated health care programs and to provide certain health care services and functions previously provided by

IHS. IHS's contractual obligation to ANTHC was to make certain specified payments to ANTHC, including payments required for ANTHC to carry out its administrative duties and other costs of carrying out the Compact.

16. ANTHC's contract was authorized by Title V of the ISDA, 25 U.S.C. §§ 5381-5399. Section 508(c) of Title V of the ISDA, 25 U.S.C. § 5388(c), requires that "[t]he Secretary shall provide funds under a funding agreement under this subchapter in an amount equal to the amount that the Indian tribe would have been entitled to receive under self-determination contracts under this chapter, including amounts for direct program costs specified under section 5325(a)(1) of this title and amounts for contract support costs specified under section 5325(a) (2), (3), (5), and (6) . . . ." This provision entitled ANTHC to the same amount it would have received had it been operating a contract with IHS that was awarded under Title I of the Act, 25 U.S.C. §§ 5321-5332, and specifically the funding provisions set forth in 25 U.S.C. § 5325(a). Thus, at all relevant times, 25 U.S.C. § 5325(a)(2), (3), and (5), and related funding provisions of Title I of the ISDA, controlled the Secretary's funding obligations under the contract. These are the same provisions that the Supreme Court construed in *Cherokee Nation* and *Ramah*, and that the Federal Circuit construed in *Arctic Slope II*.

17. The ISDA and ANTHC's contract required that IHS pay contract support costs. 25 U.S.C. § 5325(a)(2) provides that "[t]here shall be added to the amount required by paragraph (1) [i.e., the program amount] contract support costs which shall consist of an amount for the reasonable costs for activities which must be carried on by a tribal

organization as a contractor to ensure compliance with the terms of the contract and prudent management . . . ."

18.     Contract support costs are mostly "administrative expenses," *Cherokee Nation*, 543 U.S. at 634, although they more precisely fall into one of two subcategories: (1) indirect administrative (or overhead) contract support costs, "such as special auditing or other financial management costs," *id.* at 635 (citing § 5325(a)(3)(A)(ii)), and (2) direct contract support costs for certain annually recurring costs attributable directly to the personnel and facilities employed to carry out the contracted IHS programs, "such as workers' compensation insurance," *id.* (citing § 5325(a)(3)(A)(i)).

19.     The ISDA defines these costs with particularity:

> [t]he contract support costs that are eligible costs for the purposes of receiving funding under this chapter shall include the costs of reimbursing each tribal contractor for reasonable and allowable costs of—
>
>> (i) direct program expenses for the operation of the Federal program that is the subject of the contract, and
>>
>> (ii) any additional administrative or other expense related to the overhead incurred by the tribal contractor in connection with the operation of the Federal program, function, service, or activity pursuant to the contract,
>
> except that such funding shall not duplicate any funding provided under subsection (a)(1) of this section.

*Id.* § 5325(a)(3)(A).  The focus of this statutory provision is the "Federal program" that is the subject of the contract.

20.     The foregoing provision of law obligates IHS to pay (1) all of the "reasonable and allowable costs" associated with additional "direct program expenses for the operation

of the Federal program" under contract, plus (2) all of the "reasonable and allowable costs" for "any additional administrative or other expense related to the overhead incurred by the tribal contractor in connection with the operation of the [contracted] Federal program." *Id.* The only limitation on this payment obligation is that a contract support cost payment may not duplicate a program payment already made to the contractor (*i.e.*, the amount "provided under subsection (a)(1) of [§ 5325]").

21.     The ISDA directs that "[u]pon the approval of a . . . contract, the Secretary shall add to the contract the full amount of funds to which the contractor is entitled under [§ 5325(a)], subject to adjustments for each subsequent year that such tribe . . . administers a Federal program, function, service, or activity under such contract." *Id.* § 5325(g); *see id.* § 5396(a) (providing that § 5325(a)-(k) "shall apply to compacts and funding agreements authorized by [Title V]").

22.     The ISDA permits, but does not require, that contract support costs be determined in a negotiation between the parties. *Id.* § 5325(a)(3)(B) (Tribes "shall have the option to negotiate with the Secretary the amount of funds that the tribe or tribal organization is entitled to receive under such contract pursuant to this paragraph."). The Secretary's duty to add full contract support costs to a contract is not contingent upon such a negotiation.

23.     ISDA delegates to the Secretary limited regulatory and discretionary authority. *See Ramah Navajo Sch. Bd. v. Babbitt*, 87 F.3d 1338, 1344 (D.C. Cir. 1996) ("Congress has clearly expressed in the [ISDA] . . . its intent to circumscribe as tightly as

possible the discretion of the Secretary," and "[t]he statute itself reveals that not only did Congress *not* intend to commit allocation decisions to agency discretion, it intended quite the opposite; Congress left the Secretary with as little discretion as feasible in the allocation of [contract support costs]" (citation omitted)). The Secretary possesses no delegated authority from Congress to issue regulations concerning contract support costs.

24.     Title V provides that, "[u]nless expressly agreed to by the participating Indian tribe in the compact or funding agreement, the participating Indian tribe shall not be subject to any agency circular, policy, manual, guidance, or rule adopted by the Indian Health Service, except for the eligibility provisions of section 5324(g) of this title and regulations promulgated under this section." 25 U.S.C. § 5397(e). This provision was expressly incorporated into ANTHC's contract. *See* Compact, art. I, § 9(a)-(b); FY 2011-2015 FA § 8. The Secretary's Title V regulations do not address contract support cost issues, other than to note that the Secretary must provide contract support costs as specified in the ISDA. 42 C.F.R. §§ 137.79, 137.143. In sum, the ISDA provides for full recovery of all contract support costs incurred in carrying out the Federal programs that are the subject of a contract.

25.     During the fiscal year at issue here, IHS calculated and paid contract support costs pursuant to Chapter 6-3 of the Indian Health Manual ("IHS Manual" or "IHM"). *See* Ex. C, Indian Health Serv., *Indian Health Manual*, pt. 6, ch. 3 (2007). This chapter explains how IHS determines contract support cost requirements, but it is not binding on tribal contractors. *Id.* § 6-3.1(A); *see also* 25 C.F.R. § 900.5 ("Except as specifically provided

in the [ISDA] . . . an Indian tribe or tribal organization is not required to abide by any

unpublished requirements such as program guidelines, manuals, or policy directives of the

Secretary . . . .").

26.     The IHS Manual recognizes the statutory contract support costs provisions,

while providing additional "guidance to both Tribal and Agency personnel" in the

negotiation of contract support costs. IHM § 6-3.1(A). The version of the IHS Manual in

effect during the relevant time period acknowledged that:

> Throughout the operation of the program by the awardee, *total contract costs (including CSC) are eligible to be paid* as either direct or indirect costs. Since Tribes often operate more than one program, many of the costs incurred by the awardee are paid through an indirect cost allocation process, usually negotiated by the "Federal Agency" as identified under the applicable [OMB] Circular.
>
> . . . .
>
> [The ISDA] authorizes awardees to be paid CSC costs whether they are "indirect" in nature (benefitting multiple programs) or additional costs associated with operating a single program, except that such funding shall not duplicate any funding provided under [the Secretarial amount].

*Id.* § 6-3.2(B) (emphasis added).

27.     Contract support costs classified as administrative and overhead costs are

also known as indirect contract support costs. These costs are typically calculated by

reference to an indirect cost rate. An indirect cost rate is a common accounting tool that

recipients of federal funds employ to allocate administrative and overhead costs across

multiple programs supported by pooled administrative activities. *Rumsfeld v. United*

*Techs. Corp.*, 315 F.3d 1361, 1363 (Fed. Cir. 2003). Such pooled activities typically

include financial management and accounting systems, information technology systems, insurance, facilities, procurement activities, and personnel management systems.

1.      An indirect cost rate is calculated by pooling these administrative costs into an overarching "indirect cost pool," and then dividing that pool by the total amount of direct program costs that are supported, served, or benefited by the pool.  This calculation results in a ratio known as an indirect cost rate, which is then applied to the direct cost base of each program supported by the pool.

28.      To calculate the amount of indirect contract support costs IHS must reimburse ANTHC, IHS identifies the funds ANTHC spends for the operation of the Federal programs that are under contract with IHS, and calls this "the IHS direct cost base." It then allocates a proportionate share of ANTHC's indirect cost pool to this IHS direct cost base (i.e., [IHS direct cost base] x [ANTHC indirect cost rate]).  This method allocates a share of ANTHC's pooled indirect costs to cover the operation of ANTHC's contract with IHS.  The remainder of ANTHC's pooled indirect costs are allocated to other programs carried out by ANTHC (such as programs funded by grants from the State of Alaska, from private foundations, or from other federal agencies).

29.      When IHS runs Federal programs providing health care to Indian people, it uses both appropriated funds from Congress and funds collected from Medicare, Medicaid, and private insurers.  *See* Dep't of Health & Human Servs., FY 2014 IHS Congressional Budget      Justification,      at      CJ-14,      141      (available      at https://www.ihs.gov/sites/budgetformulation/themes/responsive2017/documents/FY2014

BudgetJustification.pdf).  That is, IHS bills Medicare, Medicaid, and private insurers, it collects revenues from those sources, and it then uses those revenues to operate larger Federal programs serving Indian people.  *See* 42 U.S.C. §§ 1395–1395*lll*, 1396–1396w-5, 1397aa–1397mm; *see also* H.R. Rep. No. 94-1026, at 108 (1976) ("[T]he Committee firmly expects that funds from Medicare and Medicaid will be used to expand and improve current IHS health care services and not to substitute for present expenditures.").  Revenue from these programs is generally called "third-party revenues," and the generation and expenditure of these revenues is an integral part of IHS operations.

30.    IHS applied ANTHC's indirect cost rate to determine the amount of indirect contract support costs due ANTHC each year.  But, IHS failed to apply the rate to the *entire* direct cost base associated with the full Federal program carried out by ANTHC under ANTHC's Compact with IHS.  Instead, IHS applied the indirect cost rate only to the portion of ANTHC's IHS direct cost base that was funded with IHS-appropriated dollars.  IHS excluded from the IHS direct cost base the portion of that base that was funded with third-party revenues that ANTHC collected and spent pursuant to its contract with IHS.   It is this agency action which gives rise to this Complaint.

31.    In the current version of the IHS Manual, IHS acknowledges that the portion of a Tribe's health care programs funded by third-party revenues may be considered when calculating the amount of contract support costs owed to a Tribe.  IHM §§ 6-3.2(E)(1)(a)(i), (E)(1)(b) (calculating indirect contract support costs based in part upon "the total direct costs of the total health care program"), 6-3.1(G)(34) (defining "Total Health Care

Program" to include "collections from Medicare, Medicaid, and private insurance" in addition to IHS funding), https://www.ihs.gov/ihm/pc/part-6/p6c3/.

## C. Interpretation of the Contracts.

32.     In interpreting IHS's obligations, the Supreme Court has directed that "[c]ontracts made under ISDA specify that '[e]ach provision of the [ISDA] and each provision of this Contract shall be liberally construed for the benefit of the Contractor . . . .'" *Ramah*, 567 U.S. at 194 (quoting 25 U.S.C. § 5329(c) (model agreement § 1(a)(2)) (citation updated)).  The Supreme Court has interpreted this language to mean that the government "must demonstrate that its reading [of the ISDA] is clearly required by the statutory language." *Id.*  As noted in paragraph 10, *supra*, this language is repeated in the parties' contract.

## D. Claims History.

33.     On September 30, 2020, ANTHC filed a timely claim for reimbursement of its unpaid contract support costs incurred in FY 2014.  Ex. D.

34.     ANTHC's claim letter asserted a sum certain of "$41,709,576 plus interest." The claim letter asserted that the Secretary's duty to pay contract support costs includes costs to support the portions of a tribal organization's contracted programs funded with third-party revenues received from Medicare, Medicaid and private insurers and spent to carry out an ISDA contract "as the Court held in *Navajo Health Foundation—Sage Memorial Hospital, Inc. v. Burwell*, Case No. 1:14-cv-00958 (D.N.M. Nov. 2, 2016)." *Id. See also Navajo Health Found.—Sage Mem'l Hosp., Inc. v. Burwell*, 263 F. Supp. 3d 1083

(D.N.M. 2016), *appeal dismissed*, No. 18-2043, 2018 WL 4520349 (10th Cir. July 11, 2018).

35.     On November 30, 2020, the Secretary, acting through the IHS Deputy Director for Management Operations, denied ANTHC's claim.  Ex. E.  IHS denied that the Secretary was required by contract and by law to reimburse ANTHC's indirect costs associated with the expenditure of third-party revenues spent to carry out the Federal program under contract.

### COUNT I:  BREACH OF CONTRACT FOR UNDERPAYMENT OF INDIRECT CONTRACT SUPPORT COSTS ASSOCIATED WITH THE ENTIRE FEDERAL PROGRAM UNDER CONTRACT, INCLUDING THE PORTION OF THE FEDERAL PROGRAM SUPPORTED WITH THIRD-PARTY REVENUES

36.     ANTHC incorporates all previous allegations of fact and law into this Cause of Action.

37.     When ANTHC took over operation of IHS's Federal programs, controlling law authorized ANTHC to continue to bill, collect, and spend third-party revenues, just as IHS had done prior to ANTHC's operation of these Federal programs.  25 U.S.C. §§ 1621e(a), 1621f(a)(1), 1641(c)(1)(B), 1641(d), 5325(m); 42 U.S.C. §§ 1395qq, 1396j, 1397aa–1397mm.  The billing, collection and expenditure of third-party revenues to carry out the contract was expressly contemplated by the parties' contract.

38.     ANTHC was entitled to have contract support costs added to support all the IHS Federal programs ANTHC operated in FY 2014, regardless of the extent to which those Federal programs were funded by appropriated dollars or third-party revenue dollars.

39.     IHS failed to calculate and pay the administrative costs of operating the third-party revenue-funded portion of its IHS Compact, even though generating those revenues and spending them on health care was expressly contemplated by the Compact and was an integral and essential part of the Federal program described in the Compact, *see* Compact, art. III, § 7; FY 2014 FA § 1.1.3, and even though the expenditure of those revenues pursuant to the contract caused ANTHC to incur substantial administrative costs.

40.     IHS's failure to pay ANTHC indirect contract support costs associated with ANTHC's third-party revenue-supported health care operations—that is, the failure to include these third-party revenues in the IHS direct program base against which ANTHC's indirect cost rate was applied—resulted in significant under-reimbursements to ANTHC of indirect contract support costs.  It was also contrary to law.

41.     General contract principles control the calculation of damages in government contract litigation.  This is so because "[w]hen the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals."  *United States v. Winstar Corp.*, 518 U.S. 839, 895 (1996) (quoting *Lynch v. United States*, 292 U.S. 571, 579 (1934)); *see also Mobil Oil Expl. & Producing Se., Inc. v. United States*, 530 U.S. 604, 607-08 (2000) (quoting *Winstar*, 518 U.S. at 895, and relying on the Restatement (Second) of Contracts); *Franconia Assocs. v. United States*, 536 U.S. 129, 141 (2002) (quoting *Mobil Oil*, 530 U.S. at 607, and applying principles of general contract law).

42.     General contract law on the issue of damages is clear that a contractor is entitled to damages which will protect "his 'expectation interest,' which is his interest in having the benefit of his bargain *by being put in as good a position as he would have been in had the contract been performed . . . .*"  Restatement § 344(a) (emphasis added).

43.     ANTHC incurred no less than $41,709,576 in indirect contract support costs associated with the expenditure of third-party revenue that was generated and spent pursuant to the IHS contract.  *See* Ex. D at 5.  The Secretary admits that IHS did not pay any indirect costs associated with these expenditures.  In failing to pay ANTHC this amount, the Secretary breached the Secretary's contract with ANTHC.

## COUNT II:  BREACH OF STATUTORY RIGHT FOR UNDERPAYMENT OF INDIRECT CONTRACT SUPPORT COSTS ASSOCIATED WITH THE ENTIRE FEDERAL PROGRAM UNDER CONTRACT, INCLUDING THE PORTION OF THE FEDERAL PROGRAM SUPPORTED WITH THIRD-PARTY REVENUES

44.     ANTHC incorporates all previous allegations of fact and law into this Cause of Action.

45.     The ISDA creates a right of action for money damages to remedy the Secretary's breach of his obligations under the ISDA.  25 U.S.C. § 5331.

46.     Under 25 U.S.C. §§ 5325(a)(2)-(3), the Secretary in FY 2014 had a statutory duty to reimburse ANTHC's full indirect contract support costs.

47.     The Secretary failed to pay ANTHC $41,709,576 in indirect contract support costs due in FY 2014.

48. In order to remedy the Secretary's breach of his statutory obligations, ANTHC is entitled to damages of no less than $41,709,576, plus applicable interest and attorneys' fees and costs, all as specifically prayed below.

## PRAYER FOR RELIEF

WHEREFORE, ANTHC prays that this Court grant the following relief:

(a) A declaratory judgment that in FY 2014 the Secretary acted in violation of the ISDA by failing to pay ANTHC the full amount of contract support costs that ANTHC was due under its contract with the Secretary;

(b) A declaratory judgment that in FY 2014 the Secretary breached his Contract with ANTHC by failing to pay ANTHC's full contract support cost requirement;

(c) A money judgment for $41,709,576;

(d) Interest for one year from the date each unpaid amount comprising the $41,709,576 was due, as provided for under the Prompt Payment Act, 31 U.S.C. §§ 3901-3907;

(e) Interest under the Contract Disputes Act, 41 U.S.C. §§ 7101-7109, from the date the claim was filed to the date of final payment made pursuant to a judgment of this Court;

(f) Costs and attorneys' fees incurred in pursuing this claim, as provided for under the Equal Access to Justice Act, 5 U.S.C. § 504; 28 U.S.C. § 2412; the ISDA, 25 U.S.C. § 5331(c), and other applicable law; and

(g)     Such other monetary, declaratory, and equitable relief as this Court may find

to be just.

Dated this 29th day of November 2021.

                                        SONOSKY, CHAMBERS, SACHSE, MILLER
                                            & MONKMAN, LLP

                                        By:   */s/ Lloyd B. Miller*
                                            Lloyd B. Miller
                                            Alaska Bar No. 7906040
                                            Rebecca A. Patterson
                                            Alaska Bar No. 1305028
                                            725 East Fireweed Lane, Suite 420
                                            Anchorage, AK  99503
                                            Telephone: (907) 258-6377
                                            Lloyd@sonosky.net
                                            Rebecca@sonosky.net

                                        Attorneys for Plaintiff Alaska Native Tribal
                                            Health Consortium